AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.

ANGEL RAMON LOPEZ-HERNANDEZ

## CRIMINAL COMPLAINT

CASE NUMBER: 3:24-mj- 1549-PDB

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.   From on or about December 11, 2024, in the Middle District of Florida, and elsewhere, the defendant,

> knowing and in reckless disregard of the fact that an alien had come to, entered, and remained in the United States in violation of law, did transport and move the alien within the United States by means of transportation and otherwise, in furtherance of such violation of law, for the purpose of private financial gain,

in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i).   I further state that I am a Border Patrol Agent of the United States Department of Homeland Security, Customs and Border Protection, United States Border Patrol, and that this Complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒ Yes    ☐ No

Signature of Complainant
Juan M. Miranda

Sworn to before me and subscribed in my presence,

December 13, 2024                              at          Jacksonville, Florida

PATRICIA D. BARKSDALE
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT
## AND MATERIAL WITNESS WARRANTS

I, Juan M. Miranda, being a duly sworn and appointed Border Patrol Agent for the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, hereby make the following statement.

1.      I am a Border Patrol Agent for the United States Border Patrol and have been so employed for over 17 years. I have training and experience in the enforcement of the immigration and nationality laws of the United States. In addition, I have training and experience in the preparation, presentation, and service of criminal complaints and arrest warrants.

2.      The statements contained in this affidavit are based on my personal experience and observations as well as the experiences and observations of fellow Border Patrol Agents and other law enforcement officers as they have described them to me. This affidavit does not contain every fact regarding the investigation but sets forth sufficient facts to establish probable cause to believe that on December 11, 2024, ANGEL RAMON LOPEZ-HERNANDEZ, a citizen of Mexico, transported aliens unlawfully present in the United States, for the purpose of private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i).

3.      This affidavit also sets forth probable cause to believe that OSCAR ESTRADA-CASTRO and EDUARDO LEON-CONTRERAS, each of whom is a citizen of Mexico, are material witnesses in the criminal proceedings against

LOPEZ-HERNANDEZ, that it would be impracticable to secure their presence by subpoena, and therefore that material witness warrants should be issued to secure their presence, pursuant to 18 U.S.C. § 3144.

4.    From training and experience, I know that criminal alien smuggling operations transport illegal aliens unlawfully in the United States from the border with Mexico to staging cities near the border in California, Arizona, New Mexico, and Texas. After they arrive in these cities, alien smugglers load the illegal aliens into vehicles and transport them to metropolitan areas in the United States. This travel is often broken into several different segments utilizing different drivers and vehicles to minimize detection. The smuggled illegal aliens are primarily from Mexico, Guatemala, Honduras, and El Salvador. Smuggling cartels in the United States are usually operated by Mexican nationals from Mexico and within the United States.

5.    On December 11, 2024, at approximately 9:30 a.m., Border Patrol Agent (BPA) Stephen Garland, a passenger in my vehicle at the time, was contacted by Florida Highway Patrol (FHP) Trooper Trent Sistrunk about a suspected smuggling event on Interstate 75, southbound near mile marker 437, in Columbia County, Florida. Trooper Sistrunk advised BPA Garland that he had conducted a vehicle stop at approximately 9:12 a.m. on a Ford Explorer with a Florida license tag number of 77BZSP for illegal tint and improper display of a tag. The driver was identified as ANGEL RAMON LOPEZ-HERNANDEZ, who presented a Mexican Consular Identification Card but did not have a valid driver's license. The vehicle

contained a total of four passengers and the driver. The four passengers were identified as OSCAR ESTRADA-CASTRO, EDUARDO LEON-CONTRERAS, NILSER RIVERA-ESCOBAR, and RIVERA-ESCOBAR's minor daughter.

6.     After receiving the information from Trooper Sistrunk, BPA Garland relayed the information via service radio to other Border Patrol Agents in the immediate area. BPA Jose Valentin advised that he was in the area and would respond. At approximately 9:35 a.m., BPA Valentin arrived at the location of the vehicle stop, followed shortly thereafter by Supervisory Border Patrol Agent (SBPA) Matthew Bowers. A few moments later I arrived on scene with BPA Garland. Upon BPA Valentin's arrival on scene, Trooper Sistrunk informed BPA Valentin that LOPEZ-HERNANDEZ was driver of the vehicle. At the time of BPA Valentin's arrival, all occupants of the vehicle had been placed in FHP vehicles while FHP attempted to confirm their identities, with the exception of LOPEZ-HERNANDEZ, who was being questioned by FHP outside of the patrol vehicles.

7.     Upon completion of FHP's questioning of LOPEZ-HERNANDEZ, BPA Valentin identified himself as a Border Patrol Agent and questioned LOPEZ-HERNANDEZ as to his citizenship and immigration status. LOPEZ-HERNANDEZ informed BPA Valentin that he was a citizen of Mexico and was illegally present in the United States. LOPEZ-HERNANDEZ was placed under administrative arrest and secured in BPA Valentin's patrol vehicle. At the time of his

3

arrest LOPEZ-HERNANDEZ was in possession of several forms of identification issued by the Government of Mexico.

8.      As BPA Valentin was securing LOPEZ-HERNANDEZ in his patrol vehicle, SBPA Bowers arrived at the vehicle stop. BPA Valentin and SBPA Bowers approached the two male passengers, identified themselves as Border Patrol Agents, and questioned them as to their citizenship and immigration status. Both ESTRADA-CASTRO and LEON-CONTRERAS admitted to being citizens of Mexico and both said that they did not have any immigration documents that would allow them to be or legally remain in the United States. ESTRADA-CASTRO said that he had illegally crossed the U.S./Mexico border within the past two weeks and LEON-CONTRERAS said that he had recently crossed the border illegally. They were placed under administrative arrest and placed in SBPA Bowers' patrol vehicle.

9.      At about this time I arrived at the scene along with BPA Garland. After speaking to SBPA Bowers and BPA Valentin, I approached RIVERA-ESCOBAR, identified myself as a Border Patrol Agent, and questioned her as to her and her daughter's citizenship and immigration status. RIVERA-ESCOBAR advised me that she had been previously apprehended in late 2023 after illegally crossing the U.S./Mexico border. She stated that she was processed and given a court date for some time in July 2026 but she could not recall the exact date, and then she was released into the United States. While I questioned RIVERA-ESCOBAR, BPA Garland ran records checks to verify her status and the records reflected that she had

4

failed to report to immigration authorities as required by the conditions of her release. RIVERA-ESCOBAR was placed under administrative arrest and she and her daughter were secured in my service vehicle.

10.    At the scene, agents queried immigration databases for ESTRADA-CASTRO and LEON-CONTRERAS. The checks revealed no prior immigration history for ESTRADA-CASTRO. With regard to LEON-CONTRERAS, the checks reflected that he had been encountered by immigration authorities on multiple occasions and had been issued a final order of removal from the United States. At approximately 10:30 a.m., all subjects were transported to the Jacksonville Border Patrol Station for further questioning, biometric confirmation, and processing.

11.    Records for the vehicle reflected that it was a 2015 Ford Explorer registered to LOPEZ-HERNANDEZ, that he purchased it on September 22, 2022, and that the mileage at the time of sale was 158,016. The vehicle's odometer showed that the mileage at the time of the stop was 401,996, meaning that the vehicle had been driven more than 9,000 miles per month since LOPEZ-HERNANDEZ purchased it.

12.    At approximately 11:45 a.m., all agents arrived at the Jacksonville Border Patrol Station with all five subjects. BPAs Valentin and Ramon Poventud entered the four adult subjects' fingerprints, names, and dates of birth into a biometric identification system to determine whether they had ever been encountered by immigration authorities. The records returned by the system reflected that

5

LOPEZ-HERNANDEZ, LEON-CONTRERAS, and RIVERA-ESCOBAR had been previously encountered. The system did not return any records for ESTRADA-CASTRO, indicating that he had not been previously encountered.

13.     The records for LOPEZ-HERNANDEZ showed that he had been encountered by the Border Patrol in Texas in January 2005 and had been granted a voluntary return to Mexico. The records for LEON-CONTRERAS showed that he had been encountered by immigration authorities on multiple occasions since 2016 and that he had been issued a final order of removal and removed to Mexico in July 2024.

14.     At the Border Patrol Station, BPA Garland and I interviewed RIVERA-ESCOBAR. The interview was conducted in the Spanish language. During the interview RIVERA-ESCOBAR stated that she was from Honduras and was traveling with her five-year-old daughter. She said that she had entered the United States illegally in September 2023. Upon her entry, she was arrested by immigration authorities, processed, and released with a pending court date in July 2026. She stated that she had been living in Conway, Arkansas, for over a year and was visiting family in Atlanta, Georgia, where she contacted a friend by the name of "Mari" who lived in Miami, Florida. Mari told RIVERA-ESCOBAR that she knew a person in Atlanta who could bring RIVERA-ESCOBAR to Miami. Mari then requested RIVERA-ESCOBAR's location so that she could send it to the person. A few hours later, RIVERA-ESCOBAR received a phone call from Mari stating that the driver

had arrived at her location. RIVERA-ESCOBAR was greeted by a male wearing a red T-shirt who confirmed RIVERA-ESCOBAR's identity. RIVERA-ESCOBAR stated that she and her daughter then boarded the vehicle and departed the area. The driver asked RIVERA-ESCOBAR what country she was from, to which she replied, Honduras. The driver informed her that he was Mexican.

15.     I asked RIVERA-ESCOBAR how much money she paid the driver and she said that she had not paid him anything. She said that she overheard a conversation in which the driver said that he would charge her friend, Mari, $700 for the ride. RIVERA-ESCOBAR was not sure of the exact amount because she did not make the arrangements. I asked her how many passengers were in the vehicle and she said a total of five including the driver. She said that they were in the vehicle for approximately two to three hours before they were stopped by the police.

16.     Agents contacted Immigration and Customs Enforcement, Enforcement and Removal Operations (ERO), regarding RIVERA-ESCOBAR and they advised that they would re-enroll her in ERO's Alternative to Detention program. RIVERA-ESCOBAR and her daughter were released and picked up by a family member.

17.     At the Border Patrol Station, BPA Armando Martinez interviewed ESTRADA-CASTRO. The interview was conducted in the Spanish language. During the interview, ESTRADA-CASTRO stated that he lived in Mexico with his father and sister. He said that about a year ago he decided to come to United States

to stay with family in Florida and seek employment in construction. He said that he met a guy by the name of "Coy" who lived in a neighboring town who said that he could get ESTRADA-CASTRO to Florida for $12,000. ESTRADA-CASTRO left his home on November 16, 2024, and traveled to Ciudad Juarez, Chihuahua, Mexico. He said that he illegally entered the United States in November 2024 near El Paso, Texas, by crawling under the fence with two other individuals.

18.    ESTRADA-CASTRO stated that he was picked up in a silver truck and taken to a trailer in El Paso where eight other individuals were staying. The smuggling organization would not let them leave the house but provided them with food. At that time, ESTRADA-CASTRO spoke with his family and was told that they had paid 50,000 Mexican pesos (approximately $2,500 at the current rate of exchange) to the smuggling organization. He did not know at the time of the interview whether his family had paid the entire smuggling fee. He said that after a week in El Paso he was taken to a different house in New Mexico.

19.    ESTRADA-CASTRO stated that on approximately December 7, 2024, he and seven other subjects were transported to Atlanta. Along the way to Atlanta, the driver made frequent stops at various cities delivering the occupants to their destination city. On December 9, 2024, ESTRADA-CASTRO was dropped off at a house in Atlanta. He said that in the early morning of December 11, 2024, a female and her daughter arrived at the house. He said that shortly thereafter a driver arrived to pick up him and the female with the child. They all left the house and traveled to a

gas station approximately 30 minutes away where they picked up another male. During the trip to Florida, the driver asked ESTRADA-CASTRO when he had arrived in the country and ESTRADA-CASTRO stated that he had crossed three weeks before.

20.    At the Border Patrol Station, BPAs Martinez and Poventud interviewed LEON-CONTRERAS. The interview was conducted in the Spanish language. During the interview, LEON-CONTRERAS stated that he was from Guanajuato, Mexico. He said that he had illegally entered the United States near Douglas, Arizona, in 1997. He said that he lived in Colorado for three years and has lived in Florida since 2000. He stated that he had been recently arrested for a crime in Florida and after the case was resolved he was turned over to immigration authorities and deported to Mexico in June or July 2024.

21.    LEON-CONTRERAS stated that on approximately November 18, 2024, he entered the United States illegally near Naco, Arizona. He said that after he entered the country a car picked him up and took him to a nearby house. BPA Martinez asked him if he had paid any amount at this point, to which LEON-CONTRERAS replied "no." LEON-CONTRERAS stated that he had provided the deed to his property in Mexico which was worth $7000 to his friend "Angel" to make the smuggling arrangements. He said that Angel disappeared after he got to the house near Naco, Arizona, and he has not seen him since. He stated that the house was being operated by a man known as "El Chon." He said that he was at the house

for two weeks and then was transported to Atlanta. He stated that he was taken to a plaza in Atlanta and then was transferred to the vehicle that was pulled over in Florida. He said that the driver and the three other passengers were already in the vehicle when he entered it. He said that he sat in the rear of the vehicle with the female and her child. The driver told LEON-CONTRERAS that he was taking him to his destination in Florida. BPA Martinez asked him if he had paid any money to the driver and he stated that he had not paid anything because his payment was his deed. LEON-CONTRERAS was shown a photo line-up and identified the driver as LOPEZ-HERNANDEZ.

22.    At the Border Patrol Station, BPA Martinez and I interviewed LOPEZ-HERNANDEZ. The interview was conducted in the Spanish language. Before the interview, I read LOPEZ-HERNANDEZ his constitutional rights and he acknowledged that he understood his rights and was willing to give a statement without a lawyer present. He then signed a waiver of rights form.

23.    LOPEZ-HERNANDEZ stated that he was from Teziutlan Puebla, Mexico, and was illegally present in the United States. He said that he had been living in the United States for about 20 years, having entered in May of 2003 or 2004. He said that he was the owner of the vehicle that was stopped. He said that he did not know any of the passengers who were in the vehicle. He stated that he had picked up the female passenger at a hotel and the male passengers at a Kroger's grocery store located in Atlanta. He said that he was asked to transport the female

10

passenger and her daughter to Lake Worth, Florida, and the male passengers to Bradenton/Brandon near Tampa.

24.    I asked LOPEZ-HERNANDEZ why he picked up the passengers and he said that he was unemployed and needed money. I asked him who arranged the transportation of the passengers from Atlanta to Florida and he said that a mechanic friend of his had asked him to transport the female passenger and her daughter as a favor.  He stated that he had agreed to transport the females if the mechanic paid for the gasoline. He said that another friend of his had received a call from a guy named "Popeye" and asked about transporting two males to Florida. He said that he had agreed to do so and that he was going to be paid $100 per passenger, via Western Union. He was asked how many times he had transported illegal aliens and he said about three other times. He said that he had transported illegal alien workers from North Carolina to Florida.

25.    Based upon the foregoing facts, I believe there is probable cause to establish that on December 11, 2024, ANGEL ROMAN LOPEZ-HERNANDEZ transported aliens unlawfully present in the United States, for the purpose of private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i), and that OSCAR ESTRADA-CASTRO and EDUARDO LEON-CONTRERAS are material

witnesses for whom material witness arrest warrants should be issued, pursuant to 18

U.S.C. § 3144.

Juan M. Miranda
Border Patrol Agent
United States Border Patrol
Jacksonville, Florida


Sworn to and subscribed before me
this 13th day of December 2024.

PATRICIA D. BARKSDALE
United States Magistrate Judge

12